May it please the court, I am Brian Wendler. Your honors, this case presents an opportunity for this honorable court to make clear that Rule 26 of the Federal Rules of Civil Procedure means exactly what it says and it applies equally to all parties. The case also affords this court an opportunity to make clear the jury instructions for a jury to accurately reflect the law with the correct burden of proof. In this case, Rule 26 is in place, I want to read the pertinent part of the rule under subsection E, under the heading Supplemental Disclosures, I'm sorry, Supplementing Disclosures and Responses. For an expert report, I'm sorry, for an expert whose report must be disclosed under Rule 26A2B, the party's duty to supplement extends both to information included in the report and to information given during the expert's deposition. Any additions or changes to this information must be disclosed by the time the party's pretrial disclosures under Rule 26A3 are due. In this case, plaintiffs disclosed their expert, Dr. Hull. In this case, Dr. Hull opined as an epidemiologist that there's a 6-12 week incubation period for Hepatitis C from the time of exposure to the time of symptoms. Dr. Hull was deposed by the defendant. We supplemented his report every time we sent him new information because when we disclosed him, discovery was still ongoing. At least five times we supplemented his reports with any new opinions and any new data that was supplied to him. And even if he got new data and it didn't alter his opinions, he would write a couple sentence report that says, I have reviewed these documents, it does not change my opinions. Five times we did that with our expert. On the other hand, when the defendant's expert testified in this case, Dr. Aronson, we deposed Dr. Aronson, the plaintiffs deposed Dr. Aronson in Chicago before the deposition and we also deposed the other retained expert they had, this Nancy Glasgow Roberts. We took the depositions of these individuals specifically for the purpose of finding out what their opinions were, to elaborate on their reports and also specifically to find out what information they had reviewed and more importantly, what information they had not reviewed from the file, what they had not been sent by counsel. During trial, well let me back up. On the Friday before trial, defendant sent to plaintiff's counsel what was supposed to be defendant's supplemental expert disclosure. This is the Friday before trial. Notwithstanding what Rule 26E says, we get this on the Friday before trial and it says in pertinent part, Dr. Wade, who was a treating physician who testified. On information and belief, defendant believes Dr. Wade and or other providers who have been disclosed but who have not set forth what, if any, opinions they will render in their defense. Defendant will be extremely prejudiced if Dr. Aronson, their expert, is not allowed to address any opinions of medical providers that plaintiff may have testified as their opinions were not previously disclosed. That's what the defendant claimed. They go on to state that Dr. Aronson, depending on the evidence that plaintiff introduces, may rebut saying as it pertains to symptoms, conditions, and diagnoses and whether they are slash were related to plaintiff's acute hepatitis C which spontaneously cleared. Now, keep in mind this was grossly late even if it was accurate, but they claim that because they weren't aware what Dr. Wade might testify to at trial, Dr. Aronson was going to rebut that. Well, the problem with this is Dr. Wade's deposition was taken more than a year before trial and that's the evidence that we presented at trial. Dr. Wade did not come and testify live at trial. When Dr. Aronson was testifying at trial, it became apparent that he had been supplied multiple items of information that had not been in his file at the time of his deposition. It became apparent that he had been supplied data from Defendant's Counsel that no one had bothered telling plaintiff that he had. Included in that information that had been disclosed to, supplied to Dr. Aronson by Defendant's Counsel was Dr. Wade's deposition. He had had Dr. Wade's deposition that the jury heard. He had had that deposition in his file more than a year before trial. No one bothered to tell us about it. Then Dr. Aronson, in his trial testimony, was challenging Dr. Wade's analysis by claiming things like Dr. Wade relied on some data that's not really authoritative, that's not really representative of what the science is. These were all new opinions, new disclosures, and it got to the point in the testimony at cross-examination that I, as Plaintiff's Counsel, I had to literally, during trial, ask Dr. Aronson, who was testifying remotely, I had to ask him, you know, what else have you been supplied? And he was literally going through his computer emails during trial to tell us about new emails and other things that had been sent to him that no one bothered telling plaintiff about. To this day, we still don't know everything that's been supplied to him. He said even one email, he said there was something in it, he couldn't tell what it was. So what did he testify to that was a surprise and that was very prejudicial to your case? Well, for one, what I mentioned earlier, that the information that Dr. Wade, the treating studying hepatitis C, he said that is not authoritative. On what question about hepatitis C? Dr. Wade was of the opinion, and he analogized it to COVID. He said when you get a disease like this, you have symptoms that will be ongoing for years and years and years, and like COVID, we're still studying what those symptoms are. And he said the same for hepatitis C because Dr. Aronson's opinion was that when Mr. Wallace, my client, contracted hepatitis C, some patients spontaneously clear it and their symptoms are gone. But Mr. Wallace had ongoing symptoms, not nearly as severe as the original symptoms, but he has and still has ongoing symptoms that Dr. Wade related to the contraction of the hepatitis C. And some patients, which is important in the context of this case, some patients get exposed to hepatitis C and have no symptoms. They don't know they have it. That's why it's a dangerous thing. Wasn't though the fighting thing here, and maybe I'm wrong, but not so much damages, but whether this particular defendant was the source of the bad stick, the hepatitis where he got the hepatitis C, because he had so many other trials that he was participating in. Well, that was put into play by Dr. Aronson's testimony because the studies that our experts submitted and Dr. Aronson even agreed most of the studies say that there's a six to twelve week incubation period. If you go with that six to twelve week incubation period, the other studies are out of play. And to answer your question, there were two other studies in the six month period that Dr. Aronson claimed, actually there was another one too where my client was at Pharmamedica, the defendant's facility, within that six months as well. But the total needle stick count was 100, 97 of which came from the defendant's facility during that six month period. So yes, there was a dispute, but not a very contested issue. No one came in and said that my client got hepatitis C from one of the other studies. No expert said that. I hope that answers your question. Well, with regard to Dr. Aronson, the same repeated with the other expert that the defendant brought in, Nancy Glasgow Roberts, turns out during her trial testimony, in her deposition she said an average blood draw is three to five minutes, which is important because the defendant had this assembly line process for drawing blood every one or two minutes with having people lined up. Then in her trial testimony, she said that it's okay to do it within two to three minutes, versus her three to five minutes in her deposition. We learned in her trial testimony that she reviewed the deposition testimony of the defendant's in-house expert, this Dr. Kahn, and their in-house doctor, Dr. Jordan, and she was also supplied with defendant's procedure manuals. None of that was disclosed in any way, shape, or form to plaintiffs until literally during trial. Are you saying that she changed her testimony from the deposition to trial based on the materials that you've just listed? I don't know what she based it on, but it did change. Yes, Your Honor. Is that your belief that she relied? Is that sort of the point of your argument, or are those two separate arguments? One, she changed her testimony, and two, she got additional materials. For me to honestly tell you I think that she did it because of what was supplied to her, I can't say that. I can't get inside of her head and tell you, but I think that's a fair assumption. With regard to Rule 26, I don't think there's any real question that Rule 26 was violated. In this case, a week before trial when my client had ongoing medical treatment by a doctor, and we disclosed that, that was barred because it was a Rule 26 violation because it wasn't disclosed earlier, even though the appointment was only a week before trial. Dr. Hall, when he testified, was not allowed to talk about something that was supplied to him the morning of his testimony because that was a Rule 26 violation. Rule 26 was not applied evenly. In defendant's brief in this case, they cite to the Roderick opinion, which I think is interesting because this court in the Roderick case addressed the issue of when you can disclose an expert late, not when you can bring in new opinions at trial. In this case, there are four factors in the Roderick opinion. All four of them play right in favor of the plaintiff, but this is not a case where they came pre-trial and asked to disclose experts late. They didn't do it at all. They just came in at trial and basically ambushed us. The Roderick factors, even if they are in play, are in plaintiff's favor, but I don't think the Roderick analysis is really on point because it's a pre-trial disclosure issue. I see that I'm out of time. I'll just rest on my brief on the other two issues. Unless there are any questions, I'll sit for now. Thank you. Your Honors, my name is Terri Drew. I'm here on behalf of Defendant Pharma Medical Research Institute. At the outset, I'd like to address ... I'll go in order. I do not believe there was a Rule 26 violation. The opinions, yes, I will admit, and we admitted in our brief. Certain materials were not disclosed to plaintiff that were provided to the experts, but the materials that were provided to the experts were all from plaintiff. We didn't get records with authorizations. Mr. Wendler supplied the records on an ongoing dribble basis to us.  Everything that they had up to their deposition had been disclosed. As things came after the fact, the actual documents that were sent were not disclosed, but the key issue here is not one of Dr. Aronson's opinions changed. His deposition testimony was identical to his trial testimony. Your position is not necessarily that there wasn't a violation, but that there was just no harm from it? There was no harm, no prejudice from the failure to disclose the documents that were subsequently provided to phlebotomist Roberts and Dr. Aronson. Neither one of their opinions changed. They were identical to what was in the disclosure in August of 2019 and the subsequent disclosure in January of 2020 as to Dr. Aronson, and Dr. Aronson, which is important for this court to understand, both in his deposition and in trial, said he did not have an opinion as to when Mr. Wallace contracted hepatitis. He was not addressing that issue. He was strictly addressing the factor that spontaneous clearing of hepatitis C and what that means. He had a very, very limited focus. Phlebotomist Roberts, on the other hand, none of her testimony at trial was objected to. It was a trial strategy by Mr. Wendler. He asked her on cross-examination, well, in your deposition, you said it took X number of minutes to draw blood, and now you're saying this. He impeached her. There was no change in her testimony. He took her deposition over the phone in Detroit, and she testified to the fact that based upon the manner in which the needles that are used to draw blood are manufactured and used, it would be impossible for him to have had a dirty needle stick. So as to the issues as to the disclosure, items may not have been disclosed, but it is harmless in the sense that not any of the opinions rendered by the experts during trial were one iota different than what they had been in their deposition and or their written disclosure. The other issue I'd like to address is the point raised by Mr. Wendler in his brief that the jury instruction was incorrect. The jury instruction, I believe it was instruction number 19, was correctly given. 31.02 MAI was the proper instruction. Mr. Wendler, on behalf of the plaintiff, spends a significant amount of time in his appellant's brief and his reply brief indicating that that was essentially a roving instruction. It wasn't. There was no argument at any point in time, and the evidence was very clear from his expert, from the testimony, that the issue in question was whether or not the plaintiff got hepatitis from one of the 97 blood draws, either at the first Pharmamedica test program or the second one. That was it. We argued to the jury that he had been engaged in other tests, other programs, and that it is feasible, based upon the medical, that he could have gotten hepatitis at one of these other facilities, and it had not got to the level of antibodies when he tested at Pharmamedica. Therefore, on the initial testing and screening for hepatitis C, he would have been negative. So on that issue, we believe that the instruction was proper. Counsel, let me dig into that just a little bit further. There's quite a bit of discussion in the briefs about instruction 19. Yes. And in your brief at page 15, you see the instruction properly explained the plaintiff's burden was to show that Pharmamedica most likely controlled the purportedly dirty needle that caused the hepatitis infection, as opposed to a needle controlled by one of the other research studies in which plaintiff participated. Correct. But if you look at the actual language of instruction 19, that's not what it says. It says, your verdict must be for plaintiff if you believe, first, defendant controlled the person's instrumentalities used to draw plaintiff's blood during the relevant time period in 2016. Well, the relevant time period included studies with other companies. So read literally, it would require a verdict for plaintiff if Pharmamedica controlled the needles used in all of the studies by all of the companies. Why isn't that misleading to the jury? Because there was no evidence presented to the jury other than my own argument in closing and attempt at cross-examination on Dr. Hull that these other studies were involved. Dr. Hull, and he was the only expert that testified what studies were at play. And Dr. Hull said that the window of opportunity was only limited to those studies, the two studies that were Pharmamedica. Dr. Aronson spoke generally about the period of incubation for hepatitis C, but specifically testified under oath in court that he could not say what study and he wasn't saying what study. So the jury would have understood that the relevant time period was limited? The jury understood very clearly because only individual that testified about it was Dr. Hull. And Dr. Hull said, it's these two studies that were Pharmamedica. That's it. End of story. Let me ask you about another portion of Instruction 19, and this was not briefed by either party, so I'm kind of springing this on you. Instruction 19 says your verdict must be for plaintiff if you believe, second, the transmission of hepatitis C from a blood draw does not ordinarily happen in the absence of due care. So in other words, hepatitis C is not transmitted without due care being taken. It's the opposite of what it should have said. Given that Reza Salokhbar is not necessarily familiar to jurors, why isn't that plain error? I don't believe it is plain error because I think if you look at the instruction in its totality and the way it was argued and the evidence that was presented, the entire thrust of plaintiff's theory was that draws were done in dimly lit areas. They were done at night. There was a lot of confusion. There was blood cups that had blood in it that we also, the same cups they use for water. So I think it was very clear to the jury that you don't get hepatitis C from a blood draw unless you're using a dirty needle or, you know, it's chaotic. It was pretty clear in the trial. Thank you. The other issue I want to address with regards to instruction 19-3102 is plaintiff in his brief addresses the fact that it should be a much broader instruction contributed to cause. And here, there is no contributed to cause. This is not a medical malpractice case where you have multiple physicians involved with the patient. Here it's he either got stuck at PharmaMedica and got hepatitis C or he got hepatitis C somewhere else. It's not a contribute to. Once you have hepatitis C, you have hepatitis C. So he either got it at PharmaMedica and that was the proper manner in which to instruct. The other issue raised was concerning Dr. Kahn and he testified by deposition. The district court had ordered in a motion in limine that he be precluded from testifying concerning his understanding as to the law in Missouri as to whether or not you can or cannot test employees for hepatitis C. That was cut from the video. I put him on on a very limited basis live in trial, did not go near that topic with  Plaintiff's counsel, on the other hand, cross examined him and opened the door by asking him you didn't test any of your employees for hepatitis C. Dr. Kahn is a doctor and although he was told you're not supposed to go down this path, he did. He said we didn't because I understood we can't do that. So you did instruct your ear witness that he was not to testify to that? He was instructed and he sat through the video knowing that that had been cut out. He wasn't allowed to go down that path. He asked the question, Dr. Kahn made the statement, rather than move on or ask Judge Cohen, the district judge, to instruct the jury to disregard that. There was an engagement back and forth of, well, I'm the lawyer and that's not the law. I then objected because now all we're doing is focusing on a fact that shouldn't even be before the court and it was argumentative and the judge sustained the objection. But again, the proper relief would have been to ask the judge to instruct the jury to disregard the statement. That wasn't done. Your Honor, I believe the district judge's rulings were appropriate and I would ask that this court affirm the jury verdict in this case in favor of the defendant. Thank you. Thank you, Ms. Drew. Mr. Wendler, your rebuttal. A few quick points here. With regard to Ms. Drew's argument that their experts had no changed opinions, there's a difference between a changed opinion and a new add-on opinion and that's what we have here. Dr. Aronson clearly added on this new opinion that that data that Dr. Wade had relied on was unreliable or an untrustworthy whatever his position was. The argument that this was all harmless, that the Rule 26 violations were harmless to the plaintiff, as we point out in our brief, it's the defendant's burden of proof once there's a violation showing it's the defendant's burden of proof to show lack of prejudice. In this case, we have the new opinion by Dr. Aronson and we, I'm sure Ms. Drew did too, I spent hours and hours preparing to cross-examine these witnesses at trial based on the data that I thought they had and the data they didn't have. I'm literally on the fly during trial revising my outline trying to prepare a cross-examination that makes sense with these witnesses because I find out midway through trial they've got new data. As I stated earlier, I literally had to cross-examine these witnesses during trial to find out what data, what new data they had. We wasted our expenses going to Chicago for Dr. Aronson's deposition. Anyway, my point is the burden of proof is on the defendant to show lack of prejudice. Are you saying that it's on, once it's on appeal, do you think, I understand at the time of trial. At the time of trial and on appeal, it's the defendant's burden of proof whenever there's a Rule 26 violation by the defendant or by either party, whatever party violated the to the other party. That presumes there was an objection, which there wasn't for Roberts, right? That's true. For Nancy Roberts, Glasgow, yes, that's true, but for Aronson, there definitely was. Judge Kress, I'm glad you brought up that point about that jury instruction. You're right. That second paragraph was wrong. I don't think anybody caught that until Your Honor did, but the argument that the contributed to language on the causation was unnecessary. We cite the cases in our ... I see I'm out of time. I can't finish that sentence? You may. We cited the cases that was required, which was comparative fault, pled, mitigation, third party fault. All three of those were pled by the defendant, and they put it in issue. Thank you. Thank you. Thank you both for your appearance. This case is submitted, and we'll issue an opinion when we can.